UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Fort Myers Division

----------------------------------------------------------------x

| | | |
|---|---|---|
| KEVIN DEBBS and | : | Case No.: _____ |
| LIBERTY NATIONAL TRUST, | : | |
| | : | |
| Plaintiffs, | : | COMPLAINT |
| | : | |
| - against - | : | (Jury Trial Demanded) |
| | : | |
| CDK FUND I SPV, LLC, CDK CAPITAL | : | |
| PARTNERS I, LLC, CODY KERNS, and | : | |
| ESSENTIAL FUND SERVICES | : | |
| INTERNATIONAL, LLC, | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------------x

Plaintiffs Kevin Debbs and Liberty National Trust (collectively, "Plaintiffs"), by and through their undersigned attorneys, commence this action against CDK Fund I SPV, LLC, CDK Capital Partners I, LLC, Cody Kerns and Essential Fund Services International, LLC ("EFSI") (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.    This is an action against Cody Kerns, the founder and manager of his portfolio of namesake investment vehicles, including Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and non-parties CDK Fund I, LP and CDK Fund II, LP, and associated individuals, for committing federal securities

fraud in violation of Section 10(b) of the 1934 Securities Exchange Act, and SEC Rule 10b-5 (among other violations).

2.     This action arises from Defendants' numerous misrepresentations and omissions of material facts relating to the sale of securities by Defendants and purchase of same by Plaintiffs through non-party-CDK Fund I, LP and, thereafter, Defendant CDK Fund I SPV, LLC.

3.     Defendants made both oral and written misrepresentation of fact to Plaintiffs through offering materials, marketing materials, emails, texts, investor deck presentations, newsletters, account statements, social media posts and in-person meetings relating their pooled investment vehicles, investment strategies and objectives, portfolio diversification, safeguards, supervision and due diligence designed to protect investors, proprietary trading platforms, accounts liquidity, investment skill and judgment, and the potential for profit based on their efforts.

4.     Among other fabrications, Defendants represented to Plaintiffs that they had developed and owned an algorithm that would allow investor-clients to receive high returns trading currencies on the foreign exchange market, a/k/a "forex" trading, and from a portfolio of other securities.  According to non-party-CDK Fund I, LP materials prepared and disseminated by Defendants CDK Capital Partners I, LLC and Cody Kerns to Plaintiffs, "[o]ur algorithm has 3+ years in the

forex markets delivering consistent returns." Further, they assured Plaintiffs, "[y]ou'll never see a dramatic drop or risk in capital like the equities markets."

5.     Defendants pitched themselves as providing not just high returns, but they also guaranteed the security of Plaintiffs' funds.

6.     But Defendants' representations were false when they were made to Plaintiffs. By early 2023, Defendants knew that their fraud was falling part and capital withdrawals on behalf of investors in non-party-CDK Fund I, LP were being dishonored by an undisclosed third-party vendor, but CDK Capital Partners I, LLC and Cody Kerns withheld all information relating to how investor capital – Plaintiffs' capital – had been deployed and misused while concurrently soliciting more investment from Plaintiffs for non-parties CDK Fund I, LP and CDK Fund II, LP.

7.     Ultimately, Defendants CDK Capital Partners I, LLC and Cody Kerns made a cash capital contribution of $1,253,888.14 of Plaintiffs' money into a new special purpose vehicle – CDK Fund I SPV, LLC – that gutted the few protections and rights available to Plaintiffs to recover their monies.

8.     To this day, Defendants have wrongfully held – and continue to withhold – approximately $1,253,888.14 belonging to Plaintiffs.

9.     For these and the following reasons, Plaintiffs bring this action to recover their wrongfully withheld funds and seek damages against Defendants as a result of Defendants' fraudulent and improper actions.

## THE PARTIES

10.    Plaintiff Kevin Debbs is an individual over the age of eighteen who resides in Naples, Collier County, Florida.

11.    Plaintiff Liberty National Trust is a trust formed under the laws of the State of Florida in 2020, and its trustee is Plaintiff Kevin Debbs.

12.    Upon information and belief, Defendant CDK Fund I SPV, LLC is a Florida limited liability company formed, owned and controlled by Defendant Cody Kerns with its principal place of business at 10038 Spanish Isles Blvd., Suite F19, Boca Raton, Palm Beach County, Florida.

13.    Upon information and belief, Defendant CDK Capital Partners I, LLC is a Florida limited liability company formed, owned and controlled by Defendant Cody Kerns with its principal place of business at 10038 Spanish Isles Blvd., Suite F19, Boca Raton, Palm Beach County, Florida.

14.    Upon information and belief, Defendant Cody Kerns is an individual over the age of eighteen who resides in Boca Raton, Palm Beach County, Florida.

15.    Upon information and belief, CDK Capital Partners I, LLC is the general partner and/or manager of non-parties CDK Fund I, LP and CDK Fund II,

LP, two private funds that operate as pooled investment vehicles, and Kerns Capital Management, LLC, is the investment manager of non-parties CDK Fund I, LP and CDK Fund II, LP. CDK Fund I SPV, LLC, is also a private fund that operates as a "special purpose vehicle" into which CDK Fund I, LP's investor capital, including $1,253,888.14 of Plaintiffs' capital, was contributed.

16.    Upon information and belief, non-party CDK Fund I, LP is a Delaware limited partnerships with its principal place of business also at 10038 Spanish Isles Blvd., Suite F19, Boca Raton, Palm Beach County, Florida.

17.    CDK Fund I SPV, LLC and non-party CDK Fund I, LP rely on exclusions from the definition of an 'investment company" set forth in Sections 3(c)(1) and 3(c)(7) of the Investment Company Act. These investment vehicles and their advisers, such as CDK Capital Partners I, LLC, are subject to the same prohibition against fraud as other market participants, the advisers owe a fiduciary duty to the funds they manage, and the advisers are also subject to the anti-fraud prohibitions with respect to the private fund's investors.

18.    Upon information and belief, Essential Fund Services International, LLC ("EFSI") is a New York limited liability company with its principal place of business in New York, New York and an office in Summit, New Jersey.

19.    Upon information and belief, EFSI acts as the fund administrator for CDK Fund I SPV, LLC and non-party CDK Fund I, LP, maintains the entities'

books and records, records the entities' trading activities, validates the entities' net asset valuations of assets, including with respect to equity and/or debt securities transactions therein, monitors the entities' performances and customizes, prepares and sends monthly account statements on behalf of the entities to investors, including Plaintiffs, in Florida, and liaisons with investors on behalf of CDK Fund I SPV, LLC,  CDK Capital Partners I, LLC and non-party CDK Fund I, LP.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because the case arises, in part, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

21.    This Court has supplemental jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. § 1367, because such claims are so closely related to the Securities Act and Securities Exchange Act claim that they are part of the same case and controversy.

22.    Personal jurisdiction exists over each of the Defendants, because Cody Kerns resides in Florida, CDK Capital Partners I, LLC and CDK Fund I SPV, LLC were formed and organized in Florida, non-party CDK Fund I, LP operates from its offices in Florida, and all Defendants regularly conduct business

in the State of Florida.  Further, this dispute arises out of, or is related to, the Defendants' substantial and not isolated contacts within Florida, including but not limited to operating the party and non-party Defendant companies from Palm Beach County, Florida and directing their promotions, marketing, operations, sales and services relating to securities to citizens, including Plaintiffs, in Collier County, Florida.

23.    Defendants transacted business relating to the causes of action alleged herein within the State of Florida, and/or committed tortious acts in the State of Florida, and/or committed tortious acts causing injury to persons or property in the State of Florida, including Plaintiffs.  Thus, purposeful availment renders the exercise of jurisdiction by this Court over each Defendant permissible under traditional notions of fair play and substantial justice.

24.    This Court has personal jurisdiction over EFSI, pursuant to Florida Statute § 48.193(1)(a)(1), by serving as the Fund Administrator for Florida-based CDK Fund I SPV, LLC, its manager, Florida-based CDK Capital Partners I, LLC, and non-party, Florida-based CDK Fund I, LP, for which, as alleged, EFSI received compensation and on whose behalf communicated, orally and in writing, on numerous occasions with Plaintiffs, and, on upon information and belief, with the other Defendants, within Florida.

25.    In addition, this Court also has personal jurisdiction over EFSI, pursuant to Florida Statute § 48.193(1)(a)(2), because EFSI committed tortious acts that form the subject of this complaint and evidence the conduct of business by EFSI in Florida.

26.    EFSI had and has sufficient minimum contacts with the State of Florida such that maintenance of this action will not offend traditional notions of fair play and substantial justice and it could reasonably anticipate being called before this Court for the adjudication of this dispute.

27.    The acts and omissions at issue in this proceeding occurred in Collier County, Florida and the causes of action accrued here.

28.    By virtue of the foregoing, this Court has both subject matter and *in personam* jurisdiction in this proceeding, and venue is proper in this district, pursuant to 28 U.S.C. § 1391, because the acts that form the basis of this action occurred in this district.

29.    All conditions precedent to the maintenance of this action have occurred, been satisfied, or have otherwise been waived.

## GENERAL ALLEGATIONS

30.    In or around January 2023, Plaintiff Kevin Debbs was introduced to Defendant Cody Kerns who was then marketing a securities offering in a pooled investment vehicle, non-party CDK Fund I, LP (the "Partnership"), whose

investment manager was his namesake, Kerns Capital Management, LLC, and whose general partner was his namesake, CDK Capital I Partners, LLC.

31.     Upon information and belief, the Partnership was formed on or about September 26, 2022, as a Delaware limited partnership.

32.     According to the Partnership's offering materials, Kerns Capital Management, LLC's strategy for the Partnership was to "invest in stocks and ETFs across different sectors, market capitalization and asset classes, as well as in currencies."

33.     Defendants' diversification representations were material to Plaintiffs and induced Plaintiffs to invest their capital in the Partnership. Defendants' representations were made in connection with the purchase of securities. Plaintiffs invested money in a common enterprise, CDK Fund I, LP, with the expectation of future profits generated by the efforts of Defendant Kerns and the various entities through which he ultimately managed and controlled non-party CDK Fund I, LP, to wit: CDK Capital Partners I, LLC and Kerns Capital Management, LLC.

34.     Prior to receiving Plaintiffs' investment capital, these Defendants knew that they in fact did not intend to honor the terms of Plaintiffs' investments and that the statements that Defendants made to solicit Plaintiffs' funds, including, but not limited to, investment strategy and diversification, were materially false and misleading.

35.    Defendant CDK Capital Partners I, LLC, non-party Kerns Capital Management, LLC and Defendant Cody Kerns, as the general partner, investment manager, founding member and namesake of his various companies, also misrepresented the CDK Fund I, LP's risks, despite that, long before soliciting Plaintiffs' investment capital into non-party CDK Fund I, LP, these Defendants knew that their written and oral representation were false.    Further, these Defendants continued to hide their misrepresentations and omissions about the actual nature of CDK Fund I, LP, its actual investment strategy, its actual ownership of proprietary trading software, its actual investment diversification, and the actual diligence that Defendants' had undertaken to ensure that, at all times, investor capital, including that of Plaintiffs, would always be redeemable, liquid and consequently safe.

36.    The foregoing were false and hidden by each of these Defendants when capital was first solicited from Plaintiffs for deposit into non-party CDK Fund I, LP, and each of these Defendants persisted with their scheme when they continued to solicit capital from Plaintiffs, even after each of these Defendants had actual knowledge that their fraudulent scheme was falling apart in or around April or May 2023.

37.    According to the offering documents, the stated investment strategy of non-party CDK Fund I, LP was "long-term investment returns by utilizing

sophisticated trading techniques in derivatives of foreign exchange currencies" as well as "trading other assets, such as global and US equities, options, commodities and futures, mortgaged-backed securities, and exchange-traded funds ("ETF**s**") among others."  The Partnership disclosed that it would use its "algo-ryhthmic [*sic*] software" to generate capital through "trading and arbitrage differences" and "employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit."

38.    To effect some investments, the Partnership's offering documents disclosed that  "other entities" could be formed "to hold certain investment assets that cannot be held in U.S. entities under current law.  Such entities will serve as subsidiaries of the Partnership.  The only disclosed "other entit[y]" at the time that Plaintiffs' capital was solicited was a "subsidiary, Kerns Capital Management, Inc., a British Virgin Islands limited company . . . , which will invest in certain non-U.S. based currency exchanges."    According to Defendants' offering materials, "[t]his investment strategy is designed to deliver attractive, repeatable, and scalable returns while attempting to minimize downside risk. "

39.    With respect to the diversification of the Partnership's investment strategy, these Defendants each represented to Plaintiffs that the "Partnership's strategy  is  to  invest  in  stocks  and  ETFs  across  different  sectors,  market capitalization and asset classes, and currencies that provide diversification."

40.    Further, these Defendants assured Plaintiffs, prior to Plaintiffs investing any capital in the Partnership, that the "Partnership is organized as an open-end investment partnership. Limited Partners in an open-end partnership generally receive distributions at the discretion of the General Partner and have the right to redeem their Interests."

41.    Defendant Cody Kerns and others associated with CDK Capital Partners I, LLC, orally and in writing, advised Plaintiffs that higher returns were available to investors that invested in CDK Fund I, LP, and that their returns would be even higher if they invested at least $1,000,000 or more.

42.    On January 14, 2023, Defendant Cody Kerns, in Florida, wrote to Plaintiff Kevin Debbs, in Florida, the following:

> Per our conversation & verbal agreement I would like to reiterate the said details below.
>
> Kevin Debbs will invest $1,100,000.00 principle [*sic*] with Kerns Capital. Kerns Capital has agreed to increase Kevin Debbs profit split to 35.15% of the total net profit generated effective immediately upon funds being received. Up from the original & standard profit split of 32.5%.
>
> Kerns Capital will honor the increase of profit split at 35.15% so as long as Kevin Debbs principle amount never goes below $1,100,000.00 threshold. In the event that Kevin Debbs has to withdrawal any of the said $1.1M principle that causes his principle to drop below $1.1M, Kevin Debbs will return to the standard profit split of 32.5%.

43.    On or about January 16, 2023, Plaintiffs executed a subscription agreement and invested $800,000 in the Partnership.

44.    On or about January 24, 2023, Plaintiffs executed a second subscription agreement and invested an additional $300,000 in the Partnership, which brought Plaintiffs' total investment in non-party CDK Fund I, LP to a total to $1,100,000.

45.    On March 15, 2023, the Partnership's former Fund Administrator sent Plaintiffs a "Partner Statement" for the Partnership, for the period February 1, 2023 through February 28, 2023, showing an account value of $1,157,485.71 (including the $1,100,000 of deposits through January 24, 2023).  The Partnership reported its charge of a management fee of $2,291.67 and accrued Performance Allocation of $57,485.71 for the period, despite that approximately four (4) months later, *i.e.*, July 2023, Defendant Cody Kerns and his non-party, namesake off-shore entity, Kerns Capital Management, Inc., would commence a lawsuit against FxWinning Ltd. ("FxWinning") that, as discussed more fully below, conceded or implied that *no* forex trading or other trading of securities had been executed by Defendants for the benefit of the Partnership, *i.e.*, as there was no "algo-rhythmic [*sic*] trading" software being deployed by Defendants for the Partnership to generate revenue for the Partnership (and upon which profits or losses and performance fees allegedly were allocated to Plaintiffs); it was all a sham.

46.    The filing of the lawsuit against FXWinning was the first time that Plaintiffs learned of FXWinning and of the transfer and relinquishment of oversight and control over all or substantially all of the investor capital in CDK Fund I, LP by Defendants CDK Capital Partners I, LLC, non-party Kerns Capital Management, LLC and Cody Kerns' to FXWinning.

**FxWinning Ltd.**

47.    Upon information and belief, FxWinning was a purported foreign company organized under the laws of Hong Kong in early 2020 that allegedly provided forex currency and other trading strategies through unspecified executing brokers in jurisdictions outside of the United States for non-U.S. customers, and was a fraud.

48.    According to its website, FxWinning is a "brokerage firm" offering a "powerful [ ] trading platform" "exclusive . . . to retail and institutional clients around the world" that "guarantee[s] you the best spreads and trading conditions."[1]

49.    FxWinning represents that it "has purchased Client Money Insurance (CMI) on behalf of our clients and is a member of a network of responsible global financial service providers offering additional layers of security."[2]

---

[1] FxWinning Net, Home Page, https://FxWinning.net/index_en.html; and FxWinning Net, News Page, https://www.FxWinning.pro/news?lang=en.

[2] *Id*.; FxWinning Pro, Home Page, https://www.FxWinning.pro/?lang=en.

50.     Moreover, FxWinning represents that its platform is "transparen[t]" and that FxWinning segregates all client funds from company accounts.[3]

51.     Upon information and belief, and unbeknownst to Plaintiffs at all relevant times, Defendants CDK Capital Partners I, LLC and Cody Kerns, together with non-party Kerns Capital Management, LLC, executed a "Customer Agreement" with FxWinning, pursuant to which these Defendants agreed to have no ability to track investments, no rights in respect of the alleged trading activity or alleged profits and losses allocated to their sham account(s), no rights in respect of FxWinning's other entities or unknown, foreign executing brokers, no rights to demand or receive account statements and no legal recourse, through the United States courts, against FxWinning on behalf of themselves or *their* investors, including Plaintiffs.

52.     Unbeknownst to Plaintiffs at all relevant times, FxWinning's Customer Agreement also stated, in relevant part, as follows:

> 4. CAPACITY
> 4.1 In relation to any Transaction, the Client acts as Principal and not as Agent in name of a third party. This means that, unless otherwise agreed, the Company will treat [*sic*] to the Client as a Client for all purposes and the Client will be directly and completely responsible for complying with the obligations under each Transaction made by or on behalf of the Client.

---

[3] *Id.*

4.2 If the Client acts in relation to or on behalf of another person, regardless of whether the Client identifies that person or not, the Company will not accept that person as a Client indirectly and you will not accept any obligation to that person, unless agreed specifically the opposite [*sic*].

4.9 In relation to any Transaction and Services provided by the Company to the Client, it is the Customer's responsibility to ensure that the Customer is able to accept the Services and / or perform Transactions in the country in which he resides. It is hereby acknowledged and accepted that Clients residing in the United States will not be approached by the Company.

5.8 Gains or losses from trading financial instruments are deposited / withdrawn from the Client's Account once the Transaction is closed.

5.13 The Company will carry out reconciliations of records and Segregated Funds with the records and accounts of the money that the Company maintains in Segregated Accounts on a regular basis, and any required transfer to or from the Segregated Account will take place before the close of operations on the day the reconciliation occurs. The Company reserves the right to carry out such reconciliations and transfers more frequently, if the Company considers reasonably that this is necessary to protect the interests of the Company or a Client.

5.14 The Client agrees that the Company will not be liable or have any additional obligation in the event that any credit or financial institution with which Funds are maintained Segregated fails to meet its obligations with respect to the Segregated Funds.

5.17 [T]he Client agrees that the Company may stop treating the assets as assets of the Client. (i) It is hereby acknowledged and agreed that, under all circumstances, to enable the trade, the Company must use the funds of the Clients to be able to execute the orders of the Clients with any other potential executing broker that the Company may decide. [*sic*] To use. [*sic*] In this regard, the Company will transfer the Clients' funds into the account it maintains with the executing broker solely for the execution of Clients' orders on shares

listed. The account of the Company maintained with the executing broker is the own [*sic*] account of the Company.

6.3 The Company will conduct all Transactions with the Client on a performance basis. [*sic*] only (i.e. no advice). The Company has the right to execute Transactions at even though a Transaction may not be suitable for the Client. The Company does not have any obligation, unless and experience [*sic*] provided by the Customer to the Company is accurate and the Company shall have no liability to the Customer if such information is incomplete or misleading or changes or becomes inaccurate unless the Customer has informed the Company of such changes.

7.2 The Client consents and authorizes the Company to deal with the Client or on his behalf of [*sic*] any manner that the Company deems appropriate, despite any conflict of interest or the existence of any material interest in a transaction, without prior reference to the Client.

9.2 Any foreign currency exchange risk arising from any Transaction or from the compliance by the Company of its obligations or the exercise by it of its rights under the Operating Contracts it will be assumed by the Client.

14.4 If the Client gives an instruction to withdraw funds from the Trading Account, The [*sic*] Company [*sic*] pay the specified amount on the same day the withdrawal request was made, or the next business day if the Client's request is received outside of normal operations. [*sic*] hours. [*sic*] Whether they meet the following requirements: 1. the withdrawal instruction includes all the necessary information; 2. The [sic] instruction is to make a bank transfer to the Client's account (in no case will accept payments to third parties or anonymous accounts); 3. at the time of payment, the free margin of the customer exceeds the amount specified in the withdrawal instruction, including all payment charges.

15.5 The Company will not under any circumstances be liable to the Client for any loss consequential special or indirect, loss of profit, loss of opportunity (including in relation to subsequent market movements), costs, expenses or damages that the Client may suffer in

relation to with the Operating Agreements, unless otherwise agreed in the Terms of Business.

17.6 Upon termination, the Company reserves the right to retain the Client's funds as per necessary to close positions that have already been opened and / or pay any obligation pending from the Customer under the Agreement.

17.7 Upon termination, the Company reserves the right to combine any Client Account of the Client, consolidate the Balances in said Client Accounts and offset those Balances and close the Customer Account.

53.    The FxWinning "Customer Agreement" presents a myriad of "red flags" that should have caused Defendants to never allow any limited partner capital to be sent to FxWinning.

54.    Upon information and belief, and unbeknownst to Plaintiffs at all relevant times, by the end of February 2023, FxWinning had in fact notified Defendants CDK Capital Partners I, LLC and Cody Kerns that no withdrawals would be allowed because of new "Know Your Customer/Anti-Money Laundering" requirements allegedly instituted by one of FxWinning's liquidity providers.

55.    The foregoing "red flag" was never disclosed by Defendants CDK Capital Partners I, LLC and Cody Kerns to Plaintiffs in February 2023 *before* Plaintiffs executed multiple subscription agreements in favor of and wired monies to the Partnership.

56.    Upon information and belief, and unbeknownst to Plaintiffs at all relevant times, on April 16, 2023, FxWinning posted the following on its website:

> The KYC process continues to evolve, and many clients have already been approved through emails. For those who were approved and had pending withdrawals, we are happy to inform you that the withdrawals have been processed and your accounts are properly normalized. . . . Our goal is to normalize all withdrawals as soon as possible, ensuring security and compliance with applicable regulations. We value your trust in our platform and strive to offer the highest level of service and professionalism.

57.    On April 24, 2023, the Partnership's former Fund Administrator sent Plaintiffs a "Partner Statement" for the Partnership, for the period March 1, 2023 through March 31, 2023, of $1,231,535.26.  The Partnership charged a fictitious management fee of $2,421.18 and accrued a fictitious Performance Allocation of $58,926.85 for the period to Plaintiffs, because, unbeknownst to Plaintiffs, there was no actual forex or other trading generating an underlying profit.

58.    On May 17, 2023, the Partnership's former Fund Administrator sent Plaintiffs a "Partner Statement" for the Partnership, for the period April 1, 2023 through April 30, 2023, of $1,289,386.22.  The Partnership charged a fictitious management fee of $2,687.75 and accrued a fictitious Performance Allocation of $49,141.74 for the period to Plaintiffs, because, unbeknownst to Plaintiffs, there was no actual forex or other trading generating an underlying profit.

59.    Unaware of the fraudulent scheme carried out by CDK Capital Partners I, LLC and Cody Kerns, on or about May 18, 2023, Plaintiffs executed a third subscription agreement and invested an additional $850,000 in the Partnership and wired the capital on May 24, 2023.

60.    Unbeknownst to Plaintiffs, on or about May 25 or 26, 2023, the Partnership and/or its affiliated British Virgin Islands limited company ("HoldCo"), Kerns Capital Management, Inc., sought to quietly withdraw – with no disclosure to Plaintiffs or, upon information and belief, any other existing limited partner in the Partnership – approximately $12,660,000 of investor capital from FxWinning.

61.    These Defendants never disclosed that, as late as May 2023, the Partnership's capital was no longer being deployed toward any stated investment strategy or objective.

62.    On or about May 30, 2023, Plaintiffs agreed to invest an additional $350,000 in the Partnership.

63.    Defendants made the foregoing misstatements and omissions about the Partnership to Plaintiffs and other investors in connection with the offers, purchases and sales of limited partnership interests in the partnerships – securities.

64.    Upon information and belief, on June 12, 2023, and unbeknownst to Plaintiffs at all relevant times, FxWinning posted to its website that "We expect

withdrawal payments to become effective immediately, having received the green light to start this process."

65.    The foregoing "red flags" were never disclosed to Plaintiffs in April or June 2023 *before* Plaintiffs executed multiple subscription agreements in favor of and wired monies to the Partnership.

66.    Unaware that Defendants were so concerned with FxWinning's handling of the Partnership's capital, on or about June 5, 2023, Plaintiffs agreed to invest a $1,000,00 in another offering that Defendants CDK Capital Partners I, LLC, Cody Kerns, their agents and others, were marketing and promoting, CDK Fund II, LP, which Plaintiffs funded by transfers and wires on June 5, 2023 and June 14, 2023.

67.    Upon information and belief, and unbeknownst to Plaintiffs at all relevant times, despite FxWinning's representations that the withdrawals would be forthcoming, FxWinning posted the following on its website on June 20, 2023:

> Important Notice: FxWinning Limited regrets to inform you that due to unforeseen circumstances, our services will cease on **Thursday, 22.06.2023**. Please close all open trades before **Wednesday 21.06.2023 13:00 GMT+3** to avoid possible problems. Kindly withdraw your remaining funds promptly, and our team will assist you in the process. Withdrawals will be available until Friday 30.06.2023. We apologize for any inconvenience caused and appreciate your understanding during this challenging time. (Emphasis in original.)

68.     The foregoing "red flag" was never disclosed to Plaintiffs in June 2023 *before* Plaintiffs executed additional subscription agreements in favor of and wired monies to the Partnership and non-party CDK Fund II, LP.

69.     The above Defendants knew, or were severely reckless in not knowing, that their statements and omissions about the Partnership, including with respect to Defendants' lack of diligence, proprietary "algo-rhythmic [*sic*] trading software" and oversight were false and misleading as were the descriptions of the Partnership's investment strategy, investment objectives, portfolio diversification and the limited partners' ability to quickly and regularly withdraw capital.

70.     At the same time that these Defendants were secretly trying to recover Partnership assets that they had, in effect, recklessly given to FxWinning, they and their agents were openly soliciting additional limited partner capital for the Partnership, including from Plaintiffs, and actively promoting new offerings in new pooled investment vehicles that they would also operate.  These Defendants knew, or were severely reckless in not knowing, that the Partnership did not operate or perform as represented in the offering and marketing materials and oral presentations to Plaintiffs and other investors.

71.     These misrepresentations and omissions were material, because a reasonable investor would consider the fact that Defendants did not have the investment skill, judgment or trading software to generate any of the promised

profits, did not have any compliance, supervision and diligence processes or other safeguards in place to protect investors' capital and did not have the actual investment returns as represented, in deciding whether to invest more capital throughout 2023 in the Partnership or new capital in CDK Fund II, LP during the same time period.

72.    Defendants persisted with a false narrative of Defendants' investing success, despite misrepresenting the performance of the Partnership, and misused Plaintiffs' and other investors' funds to induce additional investments and to keep their fraudulent securities scheme afloat.

73.    On June 23, 2023, the Partnership's former Fund Administrator sent Plaintiffs a "Partner Statement" for the Partnership, for the period May 1, 2023 through May 31, 2023, of $1,335,679.20.  The Partnership charged a fictitious management fee of $2,565.70 and accrued a fictious Performance Allocation of $38,698.50 for the period to Plaintiffs, because, unbeknownst to Plaintiffs, there was no actual forex or other trading generating an underlying profit for the Partnership and its limited partners, including Plaintiffs.

**Defendants Misrepresentations Finally Start To Come To Light**

74.    On July 15, 2023, in an in-person meeting in Las Vegas, Nevada, Justin Freishtat, a promoter and later officer and director of CDK Capital Partners I, LLC, advised Plaintiff Kevin Debbs, that Defendants had transferred all or

substantially all of the Partnership's assets and control over same to FxWinning and that at least seventy percent (70%) of the Partnership's assets that Defendants had sent to FxWinning were lost.

75.    On July 24, 2023, Defendant Cody Kerns and HoldCo, filed an action captioned, *Cody Kerns, Kerns Capital Management, Inc., and WFTMB Holdings, LLC v. FxWinning, Ltd., et al.*, in the Circuit Court of the 11th Judicial District, Miami-Dade County, Florida, alleging common law fraud, violations of the Florida Deceptive and Unfair Trade Practices Act, conspiracy to common fraud, negligent misrepresentation, breach of contract, unjust enrichment and fraudulent transfer against FxWinning ("FxWinning Litigation").

76.    Defendants did not disclose the commencement of the FxWinning Litigation to Plaintiffs, but they did continue to solicit additional capital from Plaintiffs after its commencement.

77.    On or about July 25, 2023, Plaintiffs agreed to wire an additional $185,000 to CDK Fund II, LP, which brought Plaintiffs' investment in non-party CDK Fund II, LP to $1,185,000.

78.    Unbeknownst to Plaintiffs, that same month, Defendants CDK Capital Partners I, LLC and Cody Kerns requested the Partnership's former Fund Administrator generate a June 2023 Partner Statement for Plaintiffs, and all other limited partners, that did not comply with GAAP.  The Fund Administrator refused

to do so and resigned shortly thereafter, which resulted in the hiring of Defendant EFSI.

79.    On August 11, 2023, Defendants sent Plaintiffs a "newsletter" advising Plaintiffs, and all other limited partners in the Partnership, that "NAV reports" for June 2023 would not reflect any adverse impact on liquidity, because the misconduct forming the basis for the FxWinning Litigation was not discovered until July 2023.  The "newsletter" also embedded a small hyperlink benignly titled, "PPM Doc" in the middle of its narrative that, if discovered by a reader, provided a link to an eighty-plus page, new Confidential Offering Memorandum that had secretly been prepared by these Defendants in the months *before* July, 2023.

80.    In relevant part, this new offering memorandum disclosed that the CDK Capital Partners I, LLC could create special purpose vehicles ("SPVs") into which CDK Capital Partners I, LLC could cause the Partnership to transfer its interests for the limited partners "who participated" in the SPVs and those limited partner's interests would "be valued by the Administrator (or independent third party) either at the cost of acquisition or at the estimated fair market value."

81.    The new offering memorandum also omitted to mention the true nature of the "investment strategy," "investment objectives," portfolio diversification or the daily liquidity that was available to support withdrawals of investor capital.

82.    The new offering memorandum omitted to even mention FxWinning, the fact that Defendants had contractually divested themselves of any diligence, responsibility, control or oversight over or recourse against FxWinning, pursuant to the terms of its Customer Agreement, or that certain Defendants had commenced the FxWinning Litigation.

83.    The new offering memorandum's "Investment Risks" included a list of general warnings, most of which concerned business operations, global currency markets and general volatility currency patterns, but contained *zero* plain-English disclosures relating to FxWinning, its "Customer Agreement," the over-concentration of Partnership's capital that had been sent to FxWinning, or that, *not later than* April or May 2023, these Defendants had known that their fraudulent offering was in trouble.

84.    Instead, these Defendants "doubled-down" on the original offering memorandum's material misrepresentation and omissions, to wit: CDK Capital Partners I, LLC promoted that its investment strategy would be dependent on "its use of sophisticated analytical tools" that it still did not possess; and "new approaches to carry[ing] out the Partnership's investment objectives," which still did not exist.  Regardless, none of these could have sufficiently apprised Plaintiffs that Defendants would simply misrepresent repeatedly the nature and true risks of investing (much less repeatedly investing) capital in the Partnership or the

immediate harm that would befall Plaintiffs upon their $1,253,888.14 in capital being contributed to Defendant CDK Fund I SPV, LLC, which if honestly revealed would have stopped Plaintiffs from committing any capital to Defendants or the Partnership.

85.     The new offering memorandum also added new restrictions that prohibited limited partners from "withdrawing any portion of its Capital Account until the completion of a period of twelve calendar months following such Limited Partner's admission to the Partnership" – a material and adverse increase in the time restriction that these Defendants had originally represented to Plaintiffs in connection with their solicitation of Plaintiffs' capital.  Plaintiffs had relied upon the original, limited time restrictions and had accepted them in connection with Plaintiffs' capital commitments to non-party CDK Fund I, LP.

86.     In August 2023, Defendants CDK Capital Partners I, LLC and Cody Kerns engaged Defendant EFSI as the new Fund Administrator.

87.     Defendants CDK Capital Partners I, LLC and Cody Kerns marketed and emphasized the trustworthiness of their fund administrators to Plaintiffs, to wit: "We have a team fit for institutional investors.  In the hedge fund space, outsourcing your team of administrators, auditors and legal council [*sic*] is highly sought after by institutional investors for regulation and trust reasons.  We decided

to incorporate that approach from the get-go to give out investors the absolute best experience when investing with us."

88.    According to its marketing materials, EFSI has "implemented a solution to capture, reconcile and verify the pricing of portfolios to shadow the investment manager's own back office reporting, while offering an important independent third party validation for investors."

89.    Concerned, on August 14, 2023, Plaintiffs submitted a Withdrawal Request of $1,200,000 to the Partnership.  CDK Capital Partners I, LLC failed and refused to respond to Plaintiffs.

90.    On August 16, 2023, EFSI sent Plaintiffs and "NAV Statement" for the Partnership, for the two-month period of April 30, 2023 through June 30, 2023, of $1,430,843.10.    The Partnership reported a "performance fee" credit of $6,114.59 for the period.  EFSI reported an initial "contribution" of $2,185,679.20 and a withdrawal of $750,000.

**Defendants Reveal That They Took Plaintiffs' Money And**
**Caused A Cash Contribution To CDK Fund I SPV, LLC**

91.    On September 5, 2023, quietly and with no disclosure to Plaintiffs, Defendants CDK Capital Partners I, LLC and Cody Kerns caused CDK Fund I SPV, LLC to be formed and organized in Florida and caused the Partnership to

make a capital contribution of $1,253,888.14 of Plaintiffs' monies to be made to Defendant CDK Fund I SPV, LLC.

92.    Like CDK Capital Partners I, LLC, Defendant CDK Fund I SPV, LLC failed and refused to respond to Plaintiffs' request for the return of their capital. Defendant Cody Kerns controls and manages both entities.

93.    On September 22, 2023, the State of Florida, Division of Corporations, declared CDK Capital Partners I, LLC inactive and administratively dissolved for its failure to file its annual report.  Of note, Chapter 617, Section 1421, of the Florida Statutes provides that a limited liability company that is administratively dissolved may *not* conduct any affairs except that are necessary to wind up and liquidate its affairs.  Upon information and belief, CDK Capital Partners I, LLC continued to openly violate the statutory constraints on its ability to operate in Florida, until it was reinstated on or about November 2, 2023.

94.    On September 29, 2023, Defendants sent Plaintiffs a "newsletter" advising Plaintiffs that EFSI would soon publish July 2023 NAV Statements that would detail "account values of both the SPV and liquid balances [that] are 100% accurate to the penny."

95.    On October 3, 2023, EFSI sent Plaintiffs a NAV Statement for their purported membership interest in CDK Fund I SPV, LLC, for the period June 30, 2023 through July 31, 2023, of $1,163,882.66.

96.     Without any explanation, Defendants CDK Capital Partners I, LLC,
CDK Fund I SPV, LLC and Cody Kerns sent the following investment "Hobson's
Choice" to Plaintiffs:

> **Liquid Balance Full Release:** Should you wish to exit, you can
> request to withdraw 100% of your September NAV liquid
> balance. Do note that this may be approximately 10-15% less
> than the July NAV, due to certain stock positions being in the
> red for August and September. In choosing this route, **you
> would formally request an exit as an LP, and upon
> agreement, sign a document to forfeit your entire SPV value
> to the GP. Consequently, this will reflect as a loss on your
> 2023 K1**. If this is the option you choose please note the
> requested redemption will be issued to you by the end of 2023.
>
> **Continue the Partnership:** By choosing this path, you uphold
> your SPV value, **preserving your liquid balance to sustain
> trading and further support the fund's continued efforts to
> address the ongoing legal dispute**. If, however, you find the
> need to access some of your liquid funds, we recommend
> requesting approximately 50% of your liquid balance. For this
> option, you will receive a K1 detailing the values of both the
> SPV and liquid balance for 2023, with the associated tax
> implications for any gains.

(emphasis added)

97.     Plaintiffs accepted neither unlawful option.

98.     On October 10, 2023, Defendants CDK Capital Partners I, LLC, CDK
Fund I SPV, LLC and Cody Kerns sent Plaintiffs a "newsletter" advising Plaintiffs
that CDK Capital Partners I, LLC and Cody Kerns had determined to "wind-up"
the Partnership on or before December 31, 2023.

99.    On October 22, 2023,  EFSI published and sent Plaintiffs a NAV Statement for  the Partnership, for the period July 31, 2023 through August 31 2023, of $273,388.81.  Defendants transferred $92,090.02 of Plaintiffs' capital to CDK Fund I SPV, LLC, leaving an adjusted balance of $181,298.79.   EFSI reported a purported loss of $23,761.19 for the period and a NAV for the period of $157,537.60 or a loss of forty-two percent (42%) of Plaintiffs' assets in the Partnership the period, despite that there was no actual forex or other trading generating an underlying profits or losses to the Partnership as a result.

100.    On October 22, 2023, EFSI published Plaintiffs' NAV Statement for CDK Fund I SPV, LLC, for the period July 31, 2023 through August 31 2023, of $1,255,972.68, which reflected Defendants' transfer of $92,090.02 from Plaintiffs' Partnership account for the same period.  EFSI reported a $107.30 loss for the period, despite that the cash capital contribution Defendants made with Plaintiffs' capital was liquid and not subject to any purported loss.

101.    On October 26, 2023,  EFSI published Plaintiffs' NAV Statement for CDK Fund I SPV, LLC, for the period August 31 2023 through September 30, 2023, of $1,253,888.14.  EFSI reported a $1,977.24 loss for the period, despite that the cash capital contribution Defendants made with Plaintiffs' capital was liquid and not subject to any purported loss.

31

102.   According to CDK Fund I SPV, LLC, Plaintiff's initial capital contribution to the limited liability company was $1,253,888.14, which represented 9.20% of all membership interests of the company.

103.   The membership interest in CDK Fund I SPV, LLC attributed to Plaintiffs are a "security" under the Securities Act of 1933.

104.   Section 3.1 of the Operating Agreement of CDK Fund I SPV, LLC, effective September 5, 2023 ("Operating Agreement"), includes the following relevant terms:

> Initial Capital Contributions. The Members will make capital contributions to the Company, in **cash**, services, or property[.][4]
>
> Interests of Members In Company Capital. The interest of each Member in the capital of the Company is set forth in **Exhibit A**[5] attached hereto.
>
> Return of Capital Contributions. Except as expressly provided herein, each Member agrees not to withdraw as a Member of the Company and no Member will be entitled to the return of any part of its capital contributions or to be paid interest in respect to either its Capital Account or its capital contributions.
>
> Capital Accounts of the Members. A separate Capital Account will be maintained for each Member in accordance with the Code and the Regulations thereunder. Capital Accounts will be adjusted as follows:

---

[4] Emphasis added.

[5] Emphasis in original.

3.1.1. increased by: (i) the fair market value of any service the Member contributes to the Company; (ii) the amount of any money the Member contributes to the Company's capital; (iii) the fair market value of any property the Member contributes to the Company's capital, net of any liabilities the Company assumes or to which the property is subject; and (iv) the Member's **share of Profits**[6] and any separately stated items of income or gain; and

3.1.2. decreased by: (i) the amount of any money the Company distributes to the Member; (ii) the fair market value of any property the Company distributes to the Member, net of any liabilities the Member assumes or to which the property is subject; and (iii) the Member's **share of Losses**[7] and any separately stated items of deduction or loss.

(emphasis added.)

105. Section 4.1.7 of the Operating Agreement, includes the following relevant term:

Limitations on Distributions. Notwithstanding anything herein to the contrary, no distribution will be made to a Member to the extent that (i) such distribution would be in violation of the Act, (ii) such distribution would render the Company insolvent, (iii) such distribution would render the receiving Member liable for a return of such distribution under the Act or (iv) such distribution would create a negative balance in the Capital Account of such Member or increase the amount by which such Capital Account balance is negative; provided that nothing in this Agreement will prohibit the Managers from causing the Company to distribute on a quarterly basis an amount sufficient to enable Members to pay federal, state and local income taxes on their distributive shares of the taxable income of the Company.

---

[6] Emphasis added.

[7] Emphasis added.

Withholding. Each Member hereby authorizes the Company to withhold and pay over any withholding or other taxes or amounts payable by the Company as a result of such Member's status as a Member. Any amounts withheld with respect to a Member pursuant to any federal, state, local or foreign tax law from a Distribution by the Company to the Member will be treated as distributed to such Member[.]

In addition to all other remedies the Company may have, the Company may withhold distributions that would otherwise be payable to such Member and apply such amount toward repayment of the loan and interest.

106.    Section 5 of the Operating Agreement includes the following relevant

term:

Initial Members. The initial Members of the Company are the Persons executing this Agreement as Members as of the date first set forth above, each of which is admitted to the Company as a Member effective contemporaneously with the execution of this Agreement by such Person.

107.    Section 5.1.2.4 of the Operating states, in relevant part, as follows:

Information Rights of Members. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all of the information to which Members are entitled under the Act, under the circumstances and subject to the conditions stated therein.

108.    Section  7 of the operating Agreement provides that CDK Fund I SPV, LLC will be managed by its Manager, and the Manager is Cody Kerns.  With regard to a member's ability to remove Mr. Kerns, the Operating Agreement provides members with little recourse:

Further, Removal. A Manager may be removed at any time with or without cause upon the vote of Members whose aggregate Membership Interests exceed 75% of the outstanding Membership Interests of the Company.

109.   Furthermore, the Operating Agreement makes clear that Defendant Cody Kerns' power and authority to make effectively every decision affecting CDK Fund I SPV, LLC and its members, including ostensibly Plaintiffs, is absolute.  Section 7 of the Operating Agreement sets forth the scope and scale of Cody Kerns' authority and responsibility:

7.1.1.1. Disposition of Assets. To make all decisions relating to the sale, lease, or other disposition of the Company's assets;

7.1.1.2. Purchase Assets. To purchase or acquire assets of all kinds for the conduct of the Company's business;

7.1.1.3. Management of the Company's Business. To manage all or any part of the Company's assets and business, including the qualification of the Company to do business in any state, territory, dependency, or country;

7.1.1.4. Open Bank and Other Accounts. To open brokerage, bank and other accounts and to deposit and maintain such funds in the name of the Company in such accounts;

7.1.1.5. Borrow Money. To borrow money and grant security interests in the Company's assets (including loans from Members) and prepay, refinance, or extend any mortgage affecting the Company's assets;

7.1.1.6. Compromise or Release Claims. To compromise or release any of the Company's claims or debts;

7.1.1.7. Employment of Agents. To select and remove all officers, agents, and employees of the Company, and to employ any Person for the operation and management of the Company's business; and

7.1.1.8. Tax Elections. To make all elections available to the Company under any federal or state tax law or regulation.

7.1.2. Power to Bind the Company. Each Manager may execute and deliver:

7.1.2.1. Contracts and Conveyances. All contracts, conveyances, assignments, leases, subleases, franchise agreements, licensing agreements, management contracts, and maintenance contracts covering or affecting the Company's assets;

7.1.2.2. Checks and Payments. All checks, drafts, and other orders for the payment of the Company's funds;

7.1.2.3. Mortgages and Promissory Notes. All promissory notes, mortgages, deeds of trust, security agreements and other similar documents;

7.1.2.4. Articles and Reports. All articles and reports pertaining to the Company's organization, qualification, and dissolution;

7.1.2.5. Tax Returns and Reports. All tax returns and reports; and 7.1.2.6. Miscellaneous. All other instruments of any kind or character relating to the Company's affairs.

110. Section 11.1.11.11.2.8 of the Operating Agreement[8] provides as

follows:

The Company was formed as a holding company for the purpose of performing the role of a special purpose vehicle to hold assets of its Members. As a startup company, the Company is subject to all the risks inherent in the commencement of a new business.

---

[8] Upon information and belief, this "Section" citation, which appears in the original, likely reflects CDK Fund I SPV, LLC's decision to amend or remove one or more provisions from an earlier, draft operating agreement at either Section "11.1.11" and/or all of Sections "11.2.1-11.2.8". Those additional terms are unknown and not part of the Operating Agreement.

111.  Section 11.1.11.11.2.8 of the Operating Agreement also requires the following "acknowledgment" of its members:

> Acknowledgment of Access to Records. Each Member acknowledges that such Member has been furnished and has reviewed the Articles of Organization and this Operating Agreement of the Company and all amendments, if any, to those documents. Each Member further acknowledges that all instruments, documents, records, books, and financial information pertaining to this investment have been made available for inspection by such Member and its professional advisors and that the books and records of the Company will be available upon reasonable notice for inspection by such Member during reasonable business hours at the Company's principal place of business or via Electronic Communication upon request by Member to Manager, where Electronic Communication will suffice.

112.  Exhibit A to the Operating Agreement memorializes Plaintiffs' alleged membership interest/equity in CDK Fund I SPV, LLC, as of September 5, 2023 as follows:

| Name | Status | Class of Common Interests | Initial Capital Contribution | Membership Interests |
|------|--------|---------------------------|------------------------------|----------------------|
| Liberty National Trust/Kevin Debbs | Member | Common Interests | 1,253,888.14 | 9.20% |

113.  Pursuant to the terms of the Operating Agreement, a Member expects to share in the profits of CDK Fund I SPV, LLC based on the efforts of Defendants CDK Capital Partners I, LLC and Cody Kerns; there is no role for a member, such as Plaintiffs, who invests in a common enterprise to generate profits, and members,

such as Plaintiffs, have no control over the management of CDK Fund I SPV, LLC.

114.   According to the Operating Agreement, Plaintiffs' $1,253,888.14 of cash was consideration for receiving 9.20% of CDK Fund I SPV, LLC's membership interests in the company that is also controlled and operated by and through the efforts of Defendants CDK Capital Partners I, LLC and its member, Cody Kerns.  These Defendants were "sellers" of securities within the meaning of the Securities Act of 1933, and, as illustrated, above, continue to allocate purported profits, losses and expenses to Plaintiffs' capital account.

115.   Defendants never provided Plaintiffs with the Operating Agreement of CDK Fund I SPV, LLC *before* causing the withdrawal and transfer of Plaintiffs' $1,253,888.14 to CDK Fund I SPV, LLC.

116.   Plaintiffs never executed the Operating Agreement of CDK Fund I SPV, LLC, despite that, in effect, Defendants CDK Capital Partners I, LLC and Cody Kerns unlawfully forced Plaintiffs to purchase their membership interest – a "security" under the Securities Act of 1933.

117.   Notwithstanding the foregoing acts and omissions, for months, CDK Fund I SPV, LLC and EFSI have caused to be sent or sent monthly electronic communications and purported "NAV Statements" from outside of Florida to

Plaintiffs in Collier County, Florida, using the following email address: investorservices@essentialfundadmin.com.

118. Every "NAV Statement" from EFSI invites Plaintiffs to contact EFSI, which operates out of New York and New Jersey, with any questions about the "NAV Statements" and to discuss any investor concerns with respect to CDK Fund I SPV, LLC.

119. Although CDK Fund I SPV, LLC's Operating Agreement does not identify any investment strategy or objectives, does not identify any trading activity, does not identify any portfolio assets that CDK Fund I SPV, LLC holds, and does not identify any function that CDK Capital Partners I, LLC performs in respect of CDK Fund I SPV, LLC, CDK Fund I SPV, LLC and EFSI have sent Plaintiffs purported "NAV Statements" reflecting fictitious monthly "losses" allocated to Plaintiffs – sham losses that even *pre-date* the formation of CDK Fund I SPV, LLC (formed and effective September 5, 2023):

| CDK FUND I SPV, LLC STATEMENT OF PARTNER'S CAPITAL ACCOUNT | | | | |
|---|---|---|---|---|
| For The Period | Adjusted Opening Balance | Gross And Net Loss Allocation | Account Value | Return For The Period |
| 7/31/23-8/31/23 | 1,255,972.68 | 107.30 | 1,255,865.38 | (0.01%) |
| 8/31/23-9/30/23 | 1,255,865.38 | 1,977.24 | 1,253,888.14 | (0.16%) |
| 9/30/23-10/31/23 | 1,253,888.14 | 1,643.49 | 1,252,244.65 | (0.13%) |

| 10/31/23-11/30/23 | 1,252,244.65 | 5,669.68 | 1,246,574.97 | (0.45%) |
| 11/30/23-12/31/23 | 1,246,574.97 | 3,382.18 | 1,243,192.79 | (0.27%) |

120.    Plaintiffs contacted EFSI in an attempt to identify the sources and verify the accuracy of the scant information published on these "NAV Statements," including, but not limited to, understanding: (i) how CDK Fund I SPV, LLC and EFSI had generated statements for periods that *pre-date* the formation of CDK Fund I SPV, LLC; (ii) if the purported "losses" were calculated and allocated correctly to Plaintiffs; and (iii) if EFSI had performed its "independent third party validation" of CDK Fund I SPV, LLC's financial books and records and asset valuation.    CDK Fund I SPV, LLC and EFSI failed and refused to provide anything.

121.    EFSI never provided Plaintiffs with any explanation to "validate" the mysterious "NAV Statements", to "validate" the books and records that purport to support the contrived "losses" or to "capture, reconcile and verify the pricing of" Plaintiffs' account.

122.    As set forth above, Defendants took and used Plaintiffs money – and the investment capital of other investors that were also unlawfully contributed to CDK Fund I SPV, LLC – on the promise of profits.

123.    On November 1, 2023, Plaintiffs, through counsel, sent a demand letter ("Demand") to Defendants Cody Kerns, CDK Fund I SPV, LLC and CDK Capital Partners I, LLC, requesting, in relevant part, the return of $1,253,888.14 from CDK Fund I SPV, LLC on or before November 11, 2023.  A true and correct copy of the Demand is annexed hereto as Exhibit A.

124.    On November 3, 2023, CDK Fund I SPV, LLC and CDK Capital Partners I, LLC caused an email to be sent from a "system administrator" email account with an address of admin@kerns.capital.  The email contained a copy of the Operating Agreement and directed Plaintiffs to "sign and send back to us at your earliest convenience."   No other explanation or contact information was furnished with this first production of the Operating Agreement.

125.    On November 6, 2023, Plaintiffs, through counsel, sent Mr. Kerns, CDK Fund I SPV, LLC and CDK Capital Partners I, LLC a litigation holder letter cautioning CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns:

> to preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure and consistent with the Florida Rules of Civil Procedure, along with any paper files, which You maintain, relating to our Client, his investments and communications with You, Your communications and investments with Flexport International, LLC ("Flexport"), Your communications and investments with Felippe T. Alves, a/k/a Philippe T. Alves, relating to Your investment in Flexport, Your communications and investments with Felippe T. Alves, a/k/a Philippe T. Alves, relating to our Client's indirect investment in Flexport through his limited partnership interest in CDK Fund II, LP, documents and communications exchanged between You and Bolder

Fund Services (USA) LLC relating to CDK Fund I, LP, documents and communications exchanged between You and Bolder Fund Services (USA) LLC relating to our Client's investments and interest in CDK Fund II, LP, documents and communications exchanged between You and Bolder Fund Services (USA) LLC relating to our Client's interests in CDK Fund I SPV, LLC, documents and communications exchanged between You and Essential Fund Services relating to CDK Fund I, LP, documents and communications exchanged between You and Essential Fund Services relating to our Client's investments and interest in CDK Fund I, LP, documents and communications exchanged between You and Essential Fund Services relating to CDK Fund II, LP, documents and communications exchanged between You and Essential Fund Services relating to our Client's interests in CDK Fund I SPV, LLC, and documents and communications relating to an action captioned, *Cody Kerns, Kerns Capital Management, Inc., and WFTMB Holdings, LLC v. FxWinning, Ltd., et al.*, in the Circuit Court of the 11th Judicial District, Miami-Dade County, Florida.

126.   On November 6, 2023, Plaintiffs, through counsel, also sent EFSI a litigation holder letter cautioning EFSI:

to preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure and consistent with the Florida Rules of Civil Procedure, along with any paper files, which EFSI maintains, relating to our Client, his investments and communications with EFSI, EFSI's communications with CDK Capital Partners I, LLC, Kerns Capital Management, LLC, CDK Fund I, LP CDK Fund I SPV, LLC and/or CDK Fund II, LP (collectively, the "Kerns Entities"), EFSI's communications with Felippe T. Alves, a/k/a Philippe T. Alves, or Ceros Financial Services, Inc. or Forte Capital Group relating to Flexport International, LLC, documents and communications exchanged between EFSI and Bolder Fund Services (USA) LLC relating to the Kerns Entities and documents and communications relating to an action captioned, *Cody Kerns, Kerns Capital Management, Inc., and WFTMB Holdings, LLC v. FxWinning, Ltd., et al.*, in the Circuit Court of the 11th Judicial District, Miami-Dade County, Florida.

127.   On November 17, 2023, Defendants notified Plaintiffs, in writing, that CDK Fund I SPV, LLC would *not* return Plaintiffs' $1,253,888.14 and had no right to the return of the money.

128.   In relevant part, Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns wrote:

> CDK Fund I SPV, LLC is owned by its members, of which your client is also.
>
> CDK Fund I SPV, LLC will be wound up – most likely, at some later date after [CDK Fund I, LP's] wind up is complete according to its operating agreement.
>
> Your client has received adequate and sufficient information reflecting the same.

129.   In contravention of the Operating Agreement, CDK Fund I SPV, LLC has failed and refused to provide any "documents, records, books, and financial information pertaining to [Plaintiffs' $1,253,888.14.] investment."

130.   Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns directly and through counsel, have misrepresented the nature and purpose of the creation of CDK Fund I SPV, LLC, the circumstances surrounding their forced sale and purchase of the security to Plaintiffs, the use of Plaintiffs' capital, the rights and privileges of membership, including to seek withdrawal of Plaintiffs' monies and to all books and records relating to the finances of CDK

Fund I SPV, LLC, which these Defendants knew to be false prior to making these representations and committing these fraudulent acts.

131.   Plaintiffs have suffered economic harm in the form of the loss of not less than $1,253,888.14 (less payment(s) to Plaintiffs), plus interest, arising from these misstatements and omissions, which Plaintiffs, like any reasonable investor, would have considered important to know the truth about prior to these Defendants engaging in their fraudulent scheme.

132.   As the beneficiary of the Trust, Mr. Debbs has likewise been harmed by these Defendants fraudulent handling of Plaintiffs' capital.

## JUSTIFIABLE RELIANCE

133.  Plaintiffs believed and relied upon the false and misleading representations described above when entering into their investments and purchasing their securities.   But for the misrepresentations and omissions committed by the Defendants concerning their lack of diligence, proprietary "algo-rhythmic [*sic*] trading software" and oversight as well as their false and misleading descriptions of the Partnership's investment strategy, investment objectives, portfolio diversification and the limited partners' ability to quickly and regularly withdraw capital, Plaintiffs would not have agreed to enter into any investments with the Defendants, would not have maintained any investment relationship with Defendants and, at the very least, would have not have allowed Defendants to strip

away Plaintiffs' limited rights and protections over their capital  by causing Plaintiffs to unknowingly (and unlawfully) contribute $1,253,888.14 of capital into CDK Fund I SPLV, LLC, which Plaintiffs cannot recover absent legal relief.

134. Plaintiffs justifiably relied upon these misrepresentations and omissions about non-party CDK Fund I, LP and CDK Fund I SPV, LLC.  As the founder and manager of these entities, together with the general partner, CDK Capital Partners I, LLC, Cody Kerns was uniquely situated to know and understand the full picture of his namesake portfolio of investment companies' finances and prospects, how much had been raised from Plaintiffs and other investors and had been misused in contravention of the offering documents and operating agreements.

135. Nonetheless,    these    Defendants    deliberately    made    the misrepresentations and omissions detailed above.

136. Plaintiffs, by contrast, were not in a position to know the non-public, undisclosed information about the party and non-party Defendants' misdeeds and deceit or of their delegation of all reasonable control and safeguards (in respect of investor capital) to foreign, sham companies and that now refuse to return Plaintiffs' capital.

## SUMMARY OF SCIENTER ALLEGATIONS

137. It is clear from the foregoing allegations that Defendants made numerous misrepresentations and omissions about investment strategy, investment objectives, portfolio diversification and the limited partners' and members' ability to quickly and regularly withdraw capital, while in possession of undisclosed facts that were contrary to their representations or necessary to make their representations complete and not misleading. Defendants therefore made these alleged misstatements knowingly and intentionally to induce Plaintiffs to provide not less than $1,253,888.14 25 in investment capital, and intended that Plaintiffs rely on them.

138. Defendants had both motive and opportunity to deceive Plaintiffs. As set forth above in detail, each stood to gain from successfully soliciting and wresting away millions of dollars from investors, including Plaintiffs, and to concurrently withhold the facts from Plaintiffs and other investors while Defendants continuously solicited investment capital for their affiliated investment vehicles without ever telling Plaintiffs the truth.

**LOSS CAUSTION**

139.  Plaintiffs have been deprived of, and lost, approximately $1,253,888.14 that was contributed by CDK Capital Partners I, LLC and Cody Kerns from non-party CDK Fund I, LP to CDK Fund I SPV, LLC.

140.  In particular, Defendants misrepresentations and omissions caused Plaintiffs to originally invest in non-party CDK Fund I, LP and, thereafter, to mislead and deceive Plaintiffs with respect to the actual purpose and role of CDK Fund I SPV, LLC as part of a scheme to wrest Plaintiffs' investment capital away.

141.  Plaintiffs would not have committed to doing any business with Defendants had Plaintiffs known the truth that was revealed afterward.

142.  Furthermore, it was Defendants' misrepresentations and omissions that caused Plaintiffs' losses, as absent those misrepresentations and omissions, Plaintiffs would still be in possession of the approximately $1,253,888.14 of which they were deprived.

**COUNT I**
**Violation of the Securities Exchange Act of 1934 and Rule 10b-5**
**(Against all Defendants)**

143.  Plaintiffs reallege and incorporate Paragraphs 1 through 142 as if fully set forth herein.

144.   This claim is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

145.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made to Plaintiffs, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

146.   As to EFSI, during the relevant period, while EFSI was performing fund administration services, non-party CDK Fund I, LP allegedly suffered significant losses as a result of the sham "algo-rythmic" [*sic*] trading activities that Defendants had marketed as the activity of their own proprietary algorithmic trading platform.  Instead of accurately accounting for the handling of Plaintiffs' monies at non-party CDK Fund I, LP then CDK Fund I SPV, LLC and the alleged losses allocated to Plaintiffs' cash account(s), EFSI accepted, recorded and published this fictitious information.

147.  EFSI, using purported net asset value, created monthly NAV Statements, which materially misrepresented the value of Plaintiffs' investments – profits and losses.

148.  The performance results in CDK Fund I, LP and CDK Fund I SPV, LLC are a fiction, because non-party CDK Fund I, LP's performance was not in fact based on bona fide trading activity and CDK Fund I SPV, LLC's Operating Agreement confirms that membership interests are based on investors' cash capital contributions, as to which no allocable profit or loss should be leveled, because it is a liquid account.

149.  EFSI's NAV Statements misrepresented profits and losses in investors' accounts, including Plaintiffs' account.

150.  Upon information and belief, Defendants directed the creation and approval of fictitious fund performance and inflated NAV for non-party CDK Fund I, LP and, thereafter, CDK Fund I SPV, LLC, to induce investors, including Plaintiffs, to continue to invest more and to not withdraw capital.

151.  Statements generated by EFSI represented, in many instances, positive returns or inexplicable losses to cash positions based upon mysterious gains or losses.  In reality, the purported profits and losses reflected in EFSI's NAV Statements were false, because the original, underlying trading activity did not

occur and the cash positions could not create the purported profits and losses allocated to Plaintiffs or other investors.

152.   In this regard, EFSI also was a cause of the other Defendants' violations concerning the false and misleading monthly NAV Statements.  EFSI prepared and disseminated to Plaintiffs in Florida, and to other investors, repeated false account statements.

153.   Had Plaintiffs known that Defendants' representations were false and misleading, Plaintiffs would not have deposited funds with Defendants.

154.   As a result of Defendants' wrongful conduct, as alleged herein, Plaintiffs have suffered economic damages in an amount to be established at trial, but not less than approximately $1,253,888.14, together with statutory attorneys' fees and costs.

155.   Defendants are jointly and severally liable to Plaintiffs for substantial damages that Plaintiffs have suffered in connection with their deceit and misuse of Plaintiffs' monies and account(s).

## COUNT II
### Violation of the Florida Securities and Investor Protection Act, Sections 517.301 and 517.211
### (Against all Defendants)

156.   Plaintiffs reallege and incorporate Paragraphs 1 through 155 as if fully set forth herein.

157.   The investments made by Plaintiffs were "securities" as defined by the Florida Securities and Investor Protection Act, Section 517.301, Florida Statutes, et seq. (the "Florida Act").

158.   Section 517.301 makes it unlawful for a person, in connection with the offer, sale, or purchase of any investment or security, directly or indirectly:

a. To employ any device, scheme, or artifice to defraud;

b. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading; or

c. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

159.   With the exception of EFSI, Defendants, by their recommendation of the foregoing securities, each "participated or aided," within the meaning of Section 517.211(1), in the "sale" of those securities, as that term is defined in Section 517.021.

160.   As alleged, Defendants violated the Florida Act by, among other things: (i) employing a device, scheme or artifice to defraud; (ii) making untrue statements of material facts and omitting to state material facts that would render the statements misleading in light of the circumstances under which they are made; (iii) engaging in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person; and (iv) knowingly and willfully falsifying, concealing, or covering up, by any trick, scheme, or device, a material

fact, making any false, fictitious, or fraudulent statement or representation, or making or using any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.

161.    As alleged, Defendants' decisions to solicit Plaintiffs' investments, to mislead Plaintiffs' as to the nature, use, operations and performance of the investment, and decision to contribute $1,253,888.14 of Plaintiffs' capital from CDK Fund I, LP to CDK Fund I SPV, LLC contrary to Defendants' assurance that any investment would be both safe and liquid, all of which was false, means that Defendants rendered fraudulent, negligent, and/or misleading investment advice to Plaintiff, in violation of Florida Statute 517.301(1)(a) when it sold securities to Plaintiffs.

162.    At all times relevant to this lawsuit, Plaintiffs reasonably relied upon Defendants and their purported expertise in managing the securities comprising the fund(s).

163.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have been damaged and have been required to retain the undersigned counsel and to pay them a reasonable fee in connection with their services.

164.    Plaintiffs demands judgment against Defendants for damages and other remedies provided by Florida Statute 517.211, including Plaintiffs' attorneys' fees and costs, and for such further relief as the Court deems just and equitable.

## COUNT III
## For Breach of Fiduciary Duty
## (Against all Defendants)

165.  Plaintiffs reallege and incorporate Paragraphs 1 through 164 as if fully set forth herein.

166.  As alleged herein, Plaintiffs entrusted Defendants with $1,253,888.14 of Plaintiffs' capital.

167.  As holders, managers and overseers of Plaintiffs' funds, Defendants, by common law and/or statute, owed fiduciary duties to Plaintiffs including, without limitation, duties of good faith and care with regard to Plaintiffs' funds.

168.  By virtue of the conduct and acts described herein, Defendants have breached their fiduciary duties to Plaintiffs.

169.  As a result of Defendants' conduct and actions as described herein, Plaintiffs have been damaged in an amount to be proven at trial, but at least approximately $1,253,888.14.

170.  Defendants' actions were willful and in reckless disregard of Plaintiffs' rights and interests, entitling Plaintiffs to punitive damages in an amount to be proven at trial.

**COUNT IV**
**For Common Law Fraud/Fraud in the Inducement**
**(Against Defendants CDK Fund I SPV LLC,**
**CDK Capital Partners I, LLC and Cody Kerns)**

171.   Plaintiffs reallege and incorporate Paragraphs 1 through 170 as if fully set forth herein.

172.   As alleged herein, each of Defendants CDK Capital Partners I, LLC and CDK Fund I SPV, LLC and Cody Kerns made, authorized or caused the misrepresentations or omissions at issue, which are summarized above.

173.    The misrepresentations and omissions set forth above were fraudulent and materials.

174.   Each of these Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made.  Each of these Defendants made the misleading statements with an intent to defraud Plaintiffs, as detailed above.

175.   Each of these Defendants had reason to expect that Plaintiffs would rely on such representations and intended that their misleading statements and omissions would fraudulently induce Plaintiffs to invest, maintain and contribute more of their capital.

176.   Plaintiffs justifiably relied on these Defendants' misrepresentations and omissions, as detailed above.  Plaintiffs did not know, and could not in the

exercise of reasonable diligence have known, of these Defendants' misrepresentations and omissions.

177.  Had Plaintiffs known of the facts regarding these Defendants, they would not have invested or contributed any capital with these Defendants.

178.  As a direct and proximate result of these Defendants' false representations and omissions, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than approximately $1,253,888.14.

179.  These Defendants received substantial economic benefit from Plaintiffs' investments.

180.  Upon information and belief, Defendants' actions were willful, malicious, and wanton.

181.  As a result of Defendants' willful, malicious, and wanton conduct, Plaintiffs are entitled to a damages award of over $1,253,888.14, together with punitive damages, costs, and interest, against all Defendants.

## COUNT V
### For Negligent Misrepresentations
### (Against all Defendants)

182.  Plaintiffs reallege and incorporate Paragraphs 1 through 181 as if fully set forth herein.

183.  Defendants provided false information to Plaintiffs regarding non-party CDK Fund I, LP and CDK Fund I SPV, LLC.

184. Defendants had a duty to disclose truthful information to Plaintiffs about the entities, the trading platform and services, including diligence performed and in place to safeguard investor capital, historically accurate rates of return and forex trading mechanisms.

185. Defendants intended for Plaintiffs to rely on the information or knew that Plaintiffs would reasonably rely on Defendants' representations.

186. Defendants failed to exercise reasonable care in obtaining or communicating the information that was provided to Plaintiffs regarding the offer and sale of securities, the purported trading platform used to generate consistent returns and the securities account services described in this Complaint.

187. Plaintiffs justifiably relied on Defendants' incorrect information and representations.

188. Plaintiffs have suffered damages in an amount to be determined at trial, but at least $1,253,888.14, as a direct result of Defendants' incorrect information and representations.

## COUNT VI
### For Conversion
### (Against Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns)

189. Plaintiffs reallege and incorporate Paragraphs 1 through 188 as if fully set forth herein.

190.   Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns accepted in excess of $1,253,888.14 of Plaintiffs' capital as a result of representations including the promise that Plaintiffs would have the ability to withdraw their funds upon request, at any time.

191.   To the contrary, Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody  have prevented the withdrawal of Plaintiffs' funds since September 2023.

192.   As of the date of this complaint, Plaintiffs' funds in their CDK Fund I SPV, LLC account total more than approximately $1,253,888.

193.   Plaintiffs are the rightful owners of the funds in their capital account balance of not less than $1,253,888.14.

194.   Inconsistent with Plaintiffs' ownership rights, Defendants  CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns' refusal to permit Plaintiffs to withdraw funds from CDK Fund I SPV, LLC has deprived Plaintiffs of their funds permanently or for an indefinite time.

195.   The actions of  Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns constitute an unlawful conversion of Plaintiffs' cash unlawfully contributed to CDK Fund I SPV, LLC.

196.   As a result, Defendants CDK Fund I SPV, LLC, CDK Capital Partners I, LLC and Cody Kerns have wrongfully converted not less than approximately $1,253,888.14 of Plaintiffs' funds.

197.   Plaintiffs are entitled to an award for their damages, plus costs and interest.

<strong><u>COUNT VII</u></strong><br><strong>For Unjust Enrichment</strong><br><strong>(Against all Defendants)</strong>

198.   Plaintiffs reallege and incorporate Paragraphs 1 through 197 as if fully set forth herein.

199.   Defendants will be unjustly enriched if they are allowed to retain Plaintiffs' funds.

200.   As set forth above, Plaintiffs transferred funds to non-party CDK Fund I, LP through Plaintiffs' account.

201.   Non-party CDK Fund I, LP together with Defendants CDK Capital Partners I, LLC and Cody Kerns received the funds and later caused a capital contribution of Plaintiffs' $1,253,888.14 to be made to CDK Fund I SPV, LLC, and upon information and belief, these Defendants have each also obtained commissions, fees, expenses and/or other financial benefits from the contribution of Plaintiffs' funds.

202.   On or before September 5, 2023, CDK Capital Partners I, LLC and Cody Kerns then caused Plaintiffs to contribute capital totaling $1,253,888.14 to CDK Fund I SPV, LLC and, together with CDK Fund I SPV, LLC, have failed to release Plaintiffs' funds despite written demand for same.

203.   The Operating Agreement of CDK Fund I SPVC, LLC was never provided to Plaintiffs prior to CDK Capital Partners I, LLC and Cody Kerns contributing Plaintiffs' $1,253,888.14 to CDK Fund I SPV, LLC, and the Operating Agreement was never executed by Plaintiffs.

204.   EFSI was engaged to provide fund administration services for CDK Fund I SPV, LLC, non-party CDK Fund I, LLP and their investors, including Plaintiffs, and, upon information and belief, obtained compensation from these entities for providing those purported services in respect of Plaintiffs as a result of Plaintiffs' contributions from non-party CDK Fund I, LP to Defendant CDK Fund I SPV, LLC.   As set forth above, however, EFSI did not provide any of the promised services despite being paid for same; rather, EFSI, assisted the other Defendants in carrying out their scheme.

205.   It would be inequitable and unjust for Defendants to retain the benefit of the funds (and any compensation or other ill-gotten gains) under the circumstances.

206.   Plaintiffs have been and will continue to suffer damages, in an amount no less than approximately $1,253,888.14, as a result of Defendants' actions.

207.   Plaintiffs are entitled to restitution from Defendants, plus costs and interest.

## COUNT VIII
### For Negligence
### (Against EFSI)

208.   Plaintiffs reallege and incorporate Paragraphs 1 through 207 as if fully set forth herein.

209.   EFSI's business is fund administration.  The general purpose of a fund administrator is to act as an independent third party to confirm that certain investment transactions have occurred for the benefit of the fund and its investors who may rely upon the independent validation of same by the third-party fund administrator.

210.   EFSI was the Fund Administrator for CDK Fund I SPV, LLC and CDK Fund I, LP, since August 2023.

211.   EFSI provides investors, including Plaintiffs, in CDK Fund I SPV, LLC and non-party CDK Fund I, LP, monthly reports that purport to show, independently-verified net asset values.

212.   As the Fund Administrator of CDK Fund I SPV, LLC and non-party CDK Fund I, LP, EFSI had duties of care to administer CDK Fund I SPV, LLC

and non-party CDK Fund I, LP, in accordance with the purposes of these entities and investors' investments.

213.  Upon information and belief, since being engaged, EFSI's purported services to CDK Fund I SPV, LLC and its investors, includes:

a.  repeated, independent investigation, inspection, analysis and/or verification of investors' (including Plaintiffs') investments and accounts' values;

b.  repeated, independent investigation into "discrepancies," irregularities, differences and/or unaccounted-for transactions for investors (including Plaintiffs);

c.  repeated, independent  diligence with third-party brokers and/or liquidity providers or banks regarding fund activities and the ability to access fund operations;

d.  repeated, independent computation, reconciliation and adjustment of  investors' investment data (including Plaintiffs') provided by Defendants;

e.  maintenance of Defendants' and Plaintiffs' trust based on EFSI's purported independent diligence, expertise and skill; and

f.  correspondence with investors regarding due diligence inquiries or other questions.

214.  Such services performed by EFSI in respect of CDK Fund I SPV, LLC were not mere administrative, bookkeeping services and functions; they were services and functions in which Defendant EFSI owed duties to CDK Fund I SPV, LLC and Plaintiffs.

215.   Upon information and belief, EFSI had access to all bank and trading accounts.

216.   EFSI breached those duties as the Fund Administrator to CDK Fund I SPV, LLC, its members and Plaintiffs for the reasons alleged above, including:

    a. As the Fund Administrator, EFSI knew or should have known that Plaintiffs' cash capital contributions could not be allocated profits or losses;

    b. As the Fund Administrator, EFSI knew or should have known that the other Defendants had promised to provide investors, including plaintiffs, with financial statements and books and records expressly identified, on such terms, as set forth in the Operating Agreement, which would allow Plaintiffs to independently verify the NAV Statements generated by EFSI, among other facts, yet EFSI  never did so at any time;

    c. As the Fund Administrator, EFSI had a duty of disclosure of the improper activities, but failed to disclose anything to anyone; and

    d. As the Fund administrator, EFSI continuously failed to provide any third-party, independent validation of the accounts, value or information presented on its NAV Statements for CDK Fund I SPV, LLC.

217.   Besides their failure to monitor, EFSI also ignore significant facts that are "red flags" with regard to the ongoing frauds, because EFSI publishes to Plaintiffs and others NAV Statements that are utterly devoid of any comprehensible information.

218.   As a direct and proximate result of the above, Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial, but at least approximately $1,253,888.14, against EFSI, plus costs and interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

A. An award of compensatory damages in an amount to be determined at trial, but no less than approximately $1,253,888.14.
B. An order requiring that Plaintiffs' funds be released and returned to Plaintiffs.
C. An accounting of all sums received by Defendants (each individually) and any proceeds from the withheld funds.
D. Disgorgement of any and all ill-gotten gains.
E. The imposition of a constructive trust of all accounts of any type, including bank held by Defendants.
F. An award of punitive damages against Defendants.
G. An award of pre-judgment and post-judgment interest on all amounts.
H. An award of Plaintiffs' attorneys' fees and costs.
I. All other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all issues so triable.

March 1, 2024

Respectfully Submitted,

By: ___/s/ John Torraco_____
John Torraco, Esq.
Florida Bar No. 0641049
The Law Offices Of. John Torraco, P.L.
P.O. Box 777

Sarasota, Florida 34230-0777
Phone: 941-740-0761
Email: johntorraco@gmail.com

Daniel Scott Furst, Esq. *
Sichenzia Ross Ference Carmel, LLP1185
Ave. of the Americas, 31st Flr.
New York, New York 10036
Phone: (212) 930-9700
Email: sfurst@srfc.law
(* Pro hac vice admission pending)

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of March 2024, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of Court. Service will be effectuated on all counsel of record via the Court's ECF/Electronic Service System.

/s/ John Torraco
John Torraco, Esq.